IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| CHARLES HOOVER, | ) | CASE NO. 1:16-cv-02928 |
| | ) | |
| Plaintiff, | ) | JUDGE DONALD C. NUGENT |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | KATHLEEN B. BURKE |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY ADMINISTRATION, | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| Defendant. | ) | |

Plaintiff Charles Hoover ("Plaintiff" or "Hoover") seeks judicial review of the final decision of Defendant Commissioner of Social Security ("Commissioner") denying his application for Supplemental Security Income ("SSI").  Doc. 1.  This Court has jurisdiction pursuant to 42 U.S.C. § 405(g).  This matter has been referred to the undersigned Magistrate Judge for a Report and Recommendation pursuant to Local Rule 72.2.  For the reasons set forth below, the undersigned recommends that the Court **AFFIRM** the Commissioner's decision.

## I.  Procedural History

Hoover protectively filed[1] an application for SSI on December 3, 2013.  Tr. 29, 204-210. He alleged a disability onset date of September 27, 2012 (Tr. 29, 204, 223), and alleged disability due to neck and low back injury, arthritis, depression, anxiety, nerve damage, leg pain, and testicle pain (Tr. 122, 135, 141, 154, 164, 227).  After initial denial by the state agency (Tr.

---

[1] The Social Security Administration explains that "protective filing date" is "The date you first contact us about filing for benefits. It may be used to establish an earlier application date than when we receive your signed application."  http://www.socialsecurity.gov/agency/glossary/ (last visited 10/24/2017).

154-160) and denial upon reconsideration (Tr. 164-168), Hoover requested a hearing (Tr. 169-178).  A hearing was held before Administrative Law Judge William Leland ("ALJ") on October 5, 2015.  Tr. 47-90.

In his November 16, 2015, decision (Tr. 26-46), the ALJ determined that Hoover had not been under a disability from December 3, 2013, the date the application was filed (Tr. 30, 42).[2] Hoover requested review of the ALJ's decision by the Appeals Council.  Tr. 23-25.  On October 19, 2016, the Appeals Council denied Hoover's request for review, making the ALJ's decision the final decision of the Commissioner.  Tr. 1-4.

## II. Evidence

### A.    Personal, educational, and vocational evidence

Hoover was born in 1966.  Tr. 204.  At the time of the hearing, Hoover was living with his wife and their 11 year old daughter.  Tr. 56.  Hoover finished school through 10th grade and then obtained his GED.  Tr. 58.   Hoover had not worked since September 27, 2012.  Tr. 58. Hoover's past work experience included work as an auto painter, sales person, and detailer.  Tr. 40, 112.

### B.    Medical evidence

#### 1.    Treatment records

##### a.    Physical impairments

---

[2] Prior to the filing of the SSI application at issue in this appeal ("current application"), Hoover filed applications for Disability Insurance Benefits ("DIB") and SSI in 2011, alleging disability beginning on May 30, 2007.  Tr. 29.  On September 26, 2012, an Administrative Law Judge issued an unfavorable disability decision.  Tr. 29-30, 101-118. ALJ Leland noted these prior filings, discussed the prior ALJ's decision, and concluded that Hoover had submitted new and substantial evidence since the prior decision that established a change in his condition and demonstrated that Hoover's physical and mental impairments imposed additional and greater limitations.  Tr. 29-30.  Thus, ALJ Leland indicated he was not bound by the prior decision.  Tr. 30.

During the relevant period, Hoover also saw his primary care physician Timothy Fetterman, M.D. for general care as well as for his pain-related complaints.  Tr.  375-408.  On September 21, 2012, he saw Dr. Fetterman with complaints of intractable back pain.  Tr. 405.  Hoover indicated he had been going to pain management on and off.  Tr. 405.  Hoover reported that he had not had any pain medication for a year and did not know what he did to cause a flare up of his pain.  Tr. 405.  Dr. Fetterman prescribed Vicodin and discussed with Hoover the need to follow up with pain management.  Tr. 406.

On October 17, 2012, Hoover saw Dr. Sean J. Nagel, M.D., in the neurosurgery department at MetroHealth, for evaluation of right hip, leg, and testicular pain.  Tr. 293-297.  Hoover reported that his pain occasionally went down into his left leg.  Tr. 293.  He described his pain as constant and rated it an 8 out of 10.  Tr. 293.  Dr. Nagel noted that Hoover had lumbar back surgeries in 2000, 2007, and 2010.[3]  Tr. 293; *see also* Tr. 287-289, 291, 433.  Hoover relayed that he improved initially following his surgeries but his improvement was not as great with his last surgery.  Tr. 293.  Hoover had been receiving treatment through the pain management clinic.  Tr. 293.  He was taking Cymbalta and Neurontin.  Tr. 293.  He had no recent physical therapy or injections.  Tr. 293.   On examination, Dr. Nagel observed that Hoover's extremities were warm and well perfused; his gait was antalgic; with the exception of some pain/limited weakness on the right, Hoover's strength was preserved; his reflexes were within normal limits; and there was no clonus.[4]  Tr. 294.  Dr. Nagel's assessment was that Hoover suffered from failed back surgery syndrome with predominant right lower extremity pain

---

[3] The record reflects back surgery in 2010 (Tr. 293, 433) and also in early 2011 (Tr. 291, 411).   It is not clear whether the surgery that is reported as occurring in 2010 actually occurred in early 2011 or whether Hoover had a surgery in 2010 as well as in 2011.

[4] "Clonus" is "1. alternate muscular contraction and relaxation in rapid succession. 2. a continuous rhythmic reflex tremor initiated by the spinal cord below an area of spinal cord injury, set in motion by reflex testing."  *See* Dorland's Illustrated Medical Dictionary, 32nd Edition, 2012, at 373.

and chronic pain syndrome.  Tr. 294.  Dr. Nagel discussed the possibility of a diagnostic injection with MetroHealth's pain team.  Tr. 294.  Hoover planned to see an outside pain management physician first.  Tr. 294.

The following day, on October 18, 2012, Hoover saw Dr. Fetterman again and Dr. Fetterman encouraged Hoover to follow up with neurosurgery or consider pain management.  Tr. 404.  On November 21, 2012, Hoover was seen by Elaine Tryon, MSN, CRNP, at the Cleveland Back and Pain Management Center for his pain complaints.  Tr. 589.  Nurse Tryon's recommendations included continued use of a TENS unit; continued use of pain medication; use of heat on the lower back; home exercises to strengthen the back and abdomen; use of ice several times each day; weight loss; no smoking; and no heavy lifting or bending.  Tr. 591.

Hoover continued to receive treatment at the Cleveland Back and Pain Management Center through 2015.  Tr. 298-358, 436-442, 443-456, 457-463, 464-470, 471-478, 479-487, 488-499, 500-512, 513-517, 518-522, 523-527, 528-540, 541-546, 547-551, 552-558, 559-565, 566-571, 572-576, 577-581, 582-584, 585-588, 659-738, 739-756.   Throughout his treatment at Cleveland Back and Pain Management Center, Hoover saw various medical providers, including Elaine Tryon, MSN, CRNP, Myra Gold, PA-C, and John H. Nickels, M.D.  Hoover's complaints included complaints of cervical spine pain, radiating into the left upper extremity; lumbar spine pain radiating down into both lower extremities; right-sided hip pain; and bilateral shoulder pain. *See e.g.,* Tr. 303, 309, 314, 511, 589-592, 666, 740, 743, 751.

Hoover also continued to see Dr. Fetterman.  On June 3, 2013, Hoover saw Dr. Fetterman for follow up regarding his back pain.  Tr. 394.  Hoover reported that he was doing well and seeing pain management.  Tr. 394, 395.  On October 10, 2013, Hoover saw Dr. Fetterman for a routine follow up regarding his medical conditions.  Tr. 389.  On examination, Dr. Fetterman

4

observed normal range of motion in Hoover's neck; normal musculoskeletal range of motion; normal motor skills and reflexes; normal muscle tone; and normal gait and coordination. Tr. 389-390.

During a July 30, 2014, visit at the Cleveland Back and Pain Management Center, Hoover reported he had aggravated his back again and his pain level was up to an 8/10. Tr. 445. He indicated that he was using a cane to ambulate and his leg felt like it was going to give way. Tr. 445. On physical examination it was noted, however, that Hoover had a normal gait, no limp, and he was ambulating without an assistive device. Tr. 446. Hoover's right hip was observed to be higher than the left, pronounced anteriorly and posteriorly. Tr. 446.

In August 2014, Hoover fell into his house and hit his head. Tr. 411. Hoover subsequently saw Dr. Fetterman on August 25, 2014, with complaints of his head injury and neck pain. Tr. 375. As recommended by Dr. Fetterman, on that same day, Hoover sought emergency room treatment regarding the symptoms relating to his fall. Tr. 411. At the emergency room, Hoover complained of headaches and sharp pain in the back of his neck. Tr. 411. Hoover relayed that his neck pain was present only with motion. Tr. 411. Hoover also reported a worsening of his chronic lower back pain. Tr. 411. Hoover's neck examination showed normal range of motion but muscular tenderness. Tr. 413. Hoover's musculoskeletal examination showed normal range of motion and no tenderness. Tr. 413. His lumbar back examination showed tenderness and pain but normal range of motion, no bony tenderness, no swelling, no edema, no deformity, no laceration, no spasm, and normal pulse. Tr. 413. Hoover also exhibited normal strength and normal reflexes. Tr. 413.

An x-ray of the lumbar spine was taken, which showed no acute fracture or malalignment, progression of mild to moderate multilevel spondylosis, and stable lower lumbar

spine facet arthropathy.  Tr. 381.  A CT of the cervical spine and a CT of the brain were taken.
Tr. 381.  The CT scans showed no evidence of acute intracranial hemorrhage or calvarial
fracture; no acute fracture involving the cervical spine; minimal retrolisthesis of C4 on C5; and
spondylosis at C3-C4 and C4-C5 with resultant canal and foraminal stenosis, noting that findings
within the ventral epidural space may signify annular fissure tears at these levels.  Tr. 383-384.
The emergency room physician discussed the radiological findings with the radiologist and it
was noted that the findings appeared to be chronic.  Tr. 414.  Hoover was discharged in stable
condition with a diagnosis of contusion.  Tr. 414.

During an August 27, 2014, pain management visit, Hoover reported his recent fall.  Tr.
436.  Hoover relayed that he had gone to the emergency room.  Tr. 439.  His CT scan was
normal but Hoover was disappointed that the emergency room had not given him anything for
the pain.  Tr. 439.  He reported, however, that he was feeling better.  Tr. 439.  During his visit,
Hoover's gait was normal, he had no limp, and he ambulated without any assistive device.  Tr.
439.  Hoover's right hip was observed to be higher than his left hip, pronounced anteriorly and
posteriorly.  Tr. 440.  Hoover continued to report intermittent right-sided testicular pain.  Tr. 440.

Hoover continued to receive pain management treatment.  During a July 15, 2015, pain
management visit, Hoover reported that his lower back pain had been worsening for the prior
three weeks but his neck pain had been stable; his pain level was stable at a 7/10.  Tr.  743.
Hoover relayed that he was planning a vacation to Tennessee the following week.  Tr. 743.
Hoover was doing well with his current medications and was advised to continue with those as
directed.  Tr. 745.  He was also advised to continue using the TENS unit, stretching, and using a
heating pad.  Tr. 745.  At a subsequent August 26, 2015, visit, Hoover reported that his neck had
been bothering him for the past few days.  Tr. 751.  However, the TENS unit and heat were

helping. Tr. 751. Hoover's lower back pain had been stable since his last office visit. Tr. 751. His reported pain level was 6/10. Tr. 751. Hoover relayed that he had had a good time on his vacation. Tr. 751. Hoover was again advised to continue on his current medication, continue with use of the TENS unit, continue stretching, and continue using heat. Tr. 753.

### b. Mental impairments

On November 19, 2012, Hoover saw Dr. Fetterman for follow up regarding his depression and anxiety. Tr. 400. Hoover was doing well and Dr. Fetterman advised Hoover to continue on his current medication for depression and anxiety. Tr. 401. On October 10, 2013, Hoover saw Dr. Fetterman for a routine follow up regarding his medical conditions. Tr. 389. Dr. Fetterman observed that Hoover's mood, memory, affect and judgment were normal. Tr. 390.

### 2. Opinion evidence

### a. Physical impairments

**Treating sources**

*Myra Gold, PA – January 2014*

On January 9, 2014, physician assistant Myra Gold completed a Medical Source Statement: Patient's Physical Capacity form.[5] Tr. 359-360. As set forth in the Medical Source Statement, for purposes of the form, "'rare' means the activity cannot be performed for any appreciable period of time, 'occasional' means from very little up to 1/3 of the workday, and 'frequent' means 1/3 to 2/3 of the workday." Tr. 359.

Ms. Gold opined that Hoover's ability to lift/carry were affected by his impairment, indicating that he could lift/carry 5 pounds occasionally and lift/carry no amount of weight

---

[5] The second page of the two page document is also contained in the record at Tr. 301 and Tr. 302.

frequently.  Tr. 359.  In support of the lifting/carrying limitations, Ms. Gold noted Hoover's three prior back surgeries and his herniated lumbar discs.  Tr. 359.  Ms. Gold opined that Hoover's ability to sit and his ability to stand/walk were affected by his impairment, indicating Hoover could stand/walk for a total of 2 hours in an 8-hour workday and 1 hour without interruption and he could sit for a total of 1 hour in an 8-hour workday and 45 minutes without interruption.  Tr. 359.  In support of the sitting and standing/walking limitations, Ms. Gold noted Hoover's herniated lumbar discs.  Tr. 359.

With respect to postural limitations, Ms. Gold opined that Hoover could rarely climb, balance, stoop, crouch, kneel or crawl.  Tr. 359.  In support of these limitations, Ms. Gold noted Hoover's herniated lumbar discs and his need to use a cane for balance.  Tr. 359.

Ms. Gold opined that Hoover could rarely push/pull; rarely perform gross manipulation; occasionally reach; and occasionally perform fine manipulation.  Tr. 360.  In support of these limitations, Ms. Gold noted Hoover's herniated lumbar discs.  Tr. 360.

With respect to environmental limitations, Ms. Gold opined that Hoover's impairments affected his ability to perform activities involving heights, moving machinery, temperature extremes, and pulmonary irritants.  Tr. 360.  There were no restrictions on performing activities involving noise.  Tr. 360.  Ms. Gold noted that, per Hoover, he experiences shortness of breath and coughing with inhalation of paint.  Tr. 360.

Ms. Gold indicated that Hoover had been prescribed a cane, TENS unit, and breathing machine.  Tr. 360.  Ms. Gold opined that Hoover would need to be able to alternate positions between sitting, standing and walking at will and he would need to elevate his legs at will at 45 degrees.  Tr. 360.  She rated Hoover's pain as severe, noting it was an 8/10.  Tr. 360.  Ms. Gold opined that Hoover's pain would interfere with concentration, take him off task, and cause

8

absenteeism.  Tr. 360.  Ms. Gold also opined that Hoover would require additional unscheduled rest periods every hour during an 8-hour workday outside of the standard 1/2 hour lunch break and two 15 minute breaks.  Tr. 360.

### John H. Nickels, M.D. – May 2014

On May 7, 2014, Dr. Nickels of the Cleveland Back and Pain Management Center sent a letter to the Adjudicator, Division of Disability Determinations, setting forth information regarding Hoover's complaints and treatment history and his opinion regarding Hoover's impairments.  Tr. 374.  Dr. Nickels explained that Hoover was first seen at the Cleveland Back and Pain Management Center in October 2012, with chief complaints of severe low back pain with radiation down both legs.  Tr. 374.  Dr. Nickels indicated that Hoover had been treated for intractable back pain with medications, including narcotic pain relievers, muscle relaxers, and anti-inflammatory medications.  Tr. 374.  He had also used a TENS unit.  Tr. 374.  Dr. Nickels further indicated that they continued to treat Hoover in a pain management program with exercises, stretches, a back brace, and medications.  Tr. 374.  However, notwithstanding all known treatments, Hoover's pain remained at the moderate to severe level, i.e., 7-to-8 out of 10. Tr. 374.  Dr. Nickels reported that Hoover's last visit with the Cleveland Back and Pain Management Center was on April 9, 2014.  Tr. 374.  Hoover was continuing to have pain in his back from a lumbar disk herniation.  Tr. 374.  Hoover was continuing to take narcotic pain relievers, muscle relaxers, anti-inflammatories and sleep medication.  Tr. 374.

In conclusion, Dr. Nickels offered his opinion, stating:

It is my medical opinion that this patient is completely and totally disabled at this time.  He is unable to do any active lifting, bending, pushing, or pulling.  This is a permanent disability for which we do not expect this patient to recover from into the future, and again, it is my medical opinion that he is completely and totally disabled on a permanent basis.

Tr. 374.

<u>Mohamed Shahed, M.D. – September 2015</u>

In September 2015, Dr. Shahed completed the same Medical Source Statement: Patient's Physical Capacity form that Ms. Gold completed.[6]  Tr. 757-758.

Dr. Shahed opined that Hoover's ability to lift/carry were affected by his impairment, indicating that he could lift/carry 10 pounds occasionally and 5 pounds frequently.  Tr. 757.  In support of the lifting/carrying limitations, Dr. Shahed noted Hoover's back pain and three prior back surgeries.  Tr. 757.  Dr. Shahed opined that Hoover's ability to sit and his ability stand/walk were affected by his impairment, indicating Hoover could stand/walk for a total of 4 hours in an 8-hour workday and 1-2 hours without interruption and Hoover could sit for a total of 4 hours in an 8-hour workday and 1-2 hours without interruption.  Tr. 757.  In support of the sitting and standing/walking limitations, Dr. Shahed noted Hoover's back pain and radiation into his legs.  Tr. 757.

With respect to postural limitations, Dr. Shahed opined that Hoover could rarely crouch, kneel or crawl and he could occasionally climb, balance or stoop.  Tr. 757.  Dr. Shahed opined that Hoover could rarely push/pull; he could occasionally reach; and he could frequently perform fine and gross manipulation.  Tr. 758.

With respect to environmental limitations, Dr. Shahed opined that Hoover's impairments affected his ability to perform activities involving heights.  Tr. 758.  There were no restrictions on performing activities involving moving machinery, temperature extremes, pulmonary irritants, or noise.  Tr. 758.

---

[6] It is not clear when Dr. Shahed treated Hoover.

Ms. Shahed indicated that Hoover had been prescribed a cane and TENS unit.  Tr. 758.

Dr. Shahed opined that Hoover would need to be able to alternate positions between sitting,

standing and walking at will.  Tr. 748.  Hoover would not need to elevate his legs at will.  Tr.

758.  Dr. Shahed rated Hoover's pain as severe.  Tr. 758.  He opined that Hoover's pain would

interfere with concentration, take him off task, and cause absenteeism.  Tr. 758.  Dr. Shahed also

opined that Hoover would require additional unscheduled rest periods every 2-3 hours during an

8-hour workday outside of the standard 1/2 hour lunch break and two 15 minute breaks.  Tr. 360.

### State agency reviewers

On February 11, 2014, State agency reviewing physician Diane Manos, M.D., completed

a Physical RFC Assessment.  Tr. 129-130.  Following her review of the medical evidence of

record, Dr. Manos concluded that Hoover had the physical RFC to do sedentary work; he could

frequently balance; he could not climb ladders, ropes, or scaffolds; he could occasionally stoop,

kneel, crouch, crawl, and climb stairs and ramps; he would need to be able to shift between

sitting and standing; and he would need to use a cane for ambulation.  Tr. 130.  Dr. Manos

indicated that her review of the medical evidence of record did not support new or material

changes and, therefore, her RFC was an adoption of the prior ALJ's RFC dated September 26,

2012.  Tr. 130.

Upon reconsideration, on May 23, 2014, state agency reviewing physician Anton

Freihofner, M.D., reviewed the medical evidence of record and reached the same conclusions as

Dr. Manos.  Tr. 144.

### b.    Mental impairments

<u>**Consultative examiner**</u>

On February 25, 2014, consultative examining psychologist Mitchell Wax, Ph.D., conducted a psychological evaluation of Hoover.  Tr. 362-367.  During the evaluation, Dr. Wax observed that Hoover appeared to be in physical distress.  Tr. 366.  He noted that Hoover was "wincing, sighing, and standing due to apparent back pain." Tr.  366.  Dr. Wax noted Hoover's past alcohol and drug use and indicated that Hoover reported a sobriety date of April 2010.  Tr. 366.  Hoover described his usual mood as being depressed.  Tr. 365.  Dr. Wax observed that Hoover appeared fretful during the evaluation and was fidgeting and needing to stand.  Tr. 365. Hoover reported anger issues, indicating that he gets into arguments with family and strangers about four times per week.  Tr. 366.  Dr. Wax observed that Hoover came to the evaluation with an edge of anger about him but he quickly softened towards Dr. Wax.  Tr. 366.  Dr. Wax indicated that Hoover presented with average intelligence with intermittent memory problems. Tr. 365.  Although Hoover had difficulty recalling information when dealing with acute pain, Dr. Wax observed that Hoover's ability to concentrate was generally good.  Tr. 365.  Hoover relayed that he cannot do much because of his back pain.  Tr. 366.  Hoover indicated he is unable to sit, stand or lie down for longer than 1-2 hour segments before he needs to change positions.  Tr. 366.  He stated he was unable to perform household chores but he was able to walk to the corner store for one or two items.  Tr. 366.  Hoover reported having friends and socializing with them regularly.  Tr. 366.

Dr. Wax diagnosed Hoover with major depression and provided the following functional assessment regarding Hoover's abilities:

**Describe the claimant's abilities and limitations in understanding, remembering, and carrying out instructions.**

This individual would be able to understand, remember and carry out instructions to work at a job. His estimated IQ based on sensorium cognitive functioning tasks is in the average range. Intermittent memory problems were noted with this believed due to his depression. For the most part though he was able to understand, remember, and carry out instructions.

**Describe the claimant's abilities and limitations in maintaining attention and concentration, and in maintaining persistence and pace, to perform simple tasks and to perform multi-step tasks.**

This individual would be able to maintain attention and concentration on a job based upon his functioning during today's evaluation. He stated he is able to attend and concentrate to play games and/or communicate on Facebook, and to watch television. He though is not persistent, stating that he starts things but does not complete them, "I have pain, and then just stop doing whatever I'm doing." He is able to perform simple tasks and perform multi-step tasks based upon his ability to go to the corner store for one or two items, and he was able to perform simple tasks and perform multi-step task[s] during today's evaluation.

**Describe the claimant's abilities and limitations in responding appropriately to supervision and to coworkers in a work setting.**

This individual would have difficulty responding appropriately to supervisors and coworkers in a work setting due to his depression. He stated when he is depressed he becomes irritable, "I get into arguments with family members and strangers four times a week." He came to the evaluation with an edge of anger about him, but softened quickly towards this psychologist as the evaluation progressed.

**Describe the claimant's abilities and limitations in responding appropriately to work pressures in a work setting.**

This individual would not respond appropriately to work pressures in a work setting due to his depression. The claimant stated that because of his back pain he is depressed, "I get started, but I get frustrated and then I just don't complete things."

Tr. 366-367 (emphasis in original).

**State agency reviewers**

On March 10, 2010, state agency reviewing psychologist Robyn Hoffman, Ph.D.,

completed a Psychiatric Review Technique ("PRT") and Mental RFC Assessment. Tr. 128, 130.

Dr. Hoffman concluded that Hoover had mild restrictions in activities of daily living; moderate difficulties in maintaining social functioning and in maintaining concentration persistence or pace; and no repeated episodes of decompensation, each of extended duration.  Tr. 128.  Dr. Hoffman also adopted the prior ALJ's September 26, 2012, RFC, concluding that Hoover had the mental RFC to perform simple or more complex tasks in an environment that would not require frequent changes; would be precluded from strict production quotas or fast-paced work environments; could interact with the public, coworkers or supervisors on a frequent basis; and would be off task up to 5% of the workday.  Tr. 130.

Upon reconsideration, on May 23, 2014, state agency reviewing psychologist Mary K. Hill, Ph.D., completed a PRT and Mental RFC Assessment.  Tr. 142-143, 144-145.  Dr. Hill reached the same conclusions as Dr. Hoffman.  Tr. 144-145.

## C.    Hearing testimony

### 1.    Plaintiff's testimony

Hoover testified and was represented at the hearing.  Tr. 56-80, 88.  Hoover indicated that his pain and need to lie down are the main reasons he is unable to work.  Tr. 58.  He explained he has a lot of pain in his neck, shoulders, and lower back with the pain shooting down both legs and into his feet.  Tr. 58, 75-76, 79-80.  Hoover described the pain as relentless, sharp and achy with the sensation of pins and needles.  Tr. 58-59, 79.  He has been advised by doctors that he has too much scar tissue so he cannot get injections and surgeons have refused to do surgery on him because of his scar tissue.  Tr. 79-80.  He stated he is really out of options.  Tr. 80.

Hoover's legs give out on him about once a month.  Tr. 59.  He described a relatively recent incident when he needed emergency room treatment after falling and hitting his head on

his house.  Tr. 59.  He was walking in his yard and his leg just gave out and he fell.  Tr. 74-75.

Hoover reported his pain is constant and indicated that with medication, on an average day, his

pain is about a 6 or 7 on a scale of 1-10 ten, with 10 being the worst.  Tr. 59.  For treatment of

his back pain, Hoover has had some success with a TENS unit and heating pad.  Tr. 63.  The

TENS unit and heating pad provide some muscle relief but they do not help him with the

shooting pain.  Tr. 63.   As part of his pain management treatment, Hoover takes Vicodin,

Gabapentin, and Tramadol.  Tr. 63.  Other than constipation, Hoover does not have side effects

from his medication.  Tr. 63.   Hoover finds that his pain makes it difficult for him to

concentrate.  Tr. 69, 77.

Hoover uses a cane.  Tr. 57.  He uses his cane anytime he goes outside.  Tr. 59.  Since

Hoover is familiar with and has been able to design the layout of his home, he does not need to

use his cane while at home.  Tr. 59-60.  Hoover estimated being able to walk about 50 feet with

his cane.  Tr. 60.  He estimated being able to sit for an hour or two and being able to stand for an

hour.[7]  Tr. 60.   Hoover estimated being able to lift a couple of pounds and thought he could lift a

gallon of milk for a very short period of time.  Tr. 60, 77.  He was not certain that he would be

able to lift two gallons of milk, one in each had, without risking a lot more pain.  Tr. 77-78.

Hoover wakes up throughout the night with pain.  Tr. 61.  From the time Hoover wakes in the

morning until he goes to bed in the evening, Hoover estimated that he lies down for about 10 out

of 16 hours.  Tr. 74.  Hoover usually lies down for about two to three hours at a time.  Tr. 74.

When lying down, Hoover elevates his legs to relieve some pressure off of his back.  Tr. 78.

Hoover indicated that his depression also prevents him from being able to work.  Tr. 61.

Hoover is not in therapy for treatment of his depression.  Tr. 61.  Hoover's primary care

[7] In response to Hoover's inquiry regarding standing during the hearing, the ALJ advised Hoover that he could stand
if he would be more comfortable.  Tr. 60.

15

physician prescribes Cymbalta for Hoover's depression.  Tr. 62.  The Cymbalta helps some, but he still gets very depressed about three times each week, which is about half the time he used to get depressed.  Tr. 61.  His bouts of depression last anywhere from a couple of hours to an entire day.  Tr. 62.  When Hoover is depressed, his wife will try to talk him out of his depression or he will separate himself from people and lie down.  Tr. 62.

Hoover takes public transportations and he also drives.  Tr. 58.  He drives about once per week.  Tr. 58.  Hoover's wife does not work.  Tr. 57, 73.  Hoover's wife performs the household chores.  Tr. 63.  Hoover indicated he had not been to the grocery store in about eight months.  Tr. 64, 76.  In the past, Hoover had walked to the corner store to pick up a couple of items but he indicated he had not done that in at least a year.  Tr. 64-65, 76.  Hoover's wife and daughter take care of their dog about 99% of the time.  Tr. 72-73.  Hoover spends most of his day in bed, watching television and sleeping.  Tr. 73.  Hoover uses his desktop computer for Facebook.  Tr. 64.  Through Facebook, he stays in touch with old childhood friends and his family.  Tr. 64-65.  He is on Facebook about an hour every day or every two to three days.  Tr. 65.  If Hoover types on the keyboard constantly for five minutes, he starts to feel pinching in his neck and has to stop typing and lie back down.  Tr. 79.  Hoover rarely plays games on the computer.  Tr. 65.  He used to play a lot of games on the computer.  Tr.  65.  Other than going to visit with his mother, Hoover does not go out to visit with other people.  Tr. 66.  If he visits with friends, they come to his home.  Tr. 66.  Hoover estimated that his friends come over to visit once or twice each week.  Tr. 66.  When Hoover's friends visit, they usually watch football together.  Tr. 66-67.

Hoover usually does not attend his daughter's school activities.  Tr. 68-69.  Hoover's wife usually attends those functions.  Tr. 69.  Hoover's family has a family reunion once every year and Hoover always attends.  Tr. 70-71.  Hoover and his wife, sister, and daughter recently

traveled by car to Tennessee for the yearly family reunion.  Tr. 70-71.  The drive down was about 10 hours.  Tr.  70.  They made the trip in one day, with Hoover, his wife and his sister splitting the driving and breaking the drive up into two or three hour segments.  Tr. 70.  While at the reunion, Hoover spent time in the pool; he spent time in his hotel room; he visited with some family members; and he attended the reunion.  Tr. 71-72.

Hoover used to attend NA meetings for his prior use of cocaine.  Tr. 67.  He stopped attending them about a year prior to the hearing.  Tr.  67.  He stopped attending the meetings because of his pain – it was too difficult for him to sit at the meetings.  Tr. 67.  Hoover still continues to talk with or see his sponsor at least once each week.  Tr. 67.  Hoover reported last smoking, drinking or using any illegal drugs on April 14, 2010.  Tr.  67.

### 2.        Vocational expert's testimony

Vocational Expert Ted Macy ("VE") testified at the hearing.  Tr.  80-87.

The ALJ asked the VE a series of hypothetical questions.  For his first hypothetical, the ALJ asked the VE to assume an individual of Hoover's age and with his education who has the ability to perform sedentary work with the additional limitations of: frequently balance; cannot climb ladders, ropes, or scaffolds; occasionally stoop, kneel, crouch, crawl, and climb ramps and stairs; would require an option to shift between sitting and standing every hour and require the use of a cane for ambulation; could perform simple or more complex tasks in an environment that does not require frequent changes; precluded from strict production quotas or fast-paced work environments; could interact with the public, coworkers, and supervisors on a frequent basis; and would be off task up to 5% of the workday.  Tr. 81.  The VE indicated that the described individual would not be able to perform Hoover's past work.  Tr. 81.  However, there

would be sedentary unskilled jobs that the described individual could perform, including table worker, final assembler, and bonder.[8]  Tr. 81-82.

For the ALJ's second hypothetical, the ALJ asked the VE to assume an individual of Hoover's age and with his education who has the ability to perform sedentary work with the additional limitations of:  would be able to alternate to standing for five minutes after every one hour of sitting and alternate to sitting for five minutes after every one hour of standing or walking; occasionally climb ramps and stairs; never climb ladders, ropes and scaffolds; occasionally balance; occasionally stoop, kneel, crouch, and crawl; never be exposed to unprotected heights, moving mechanical parts, or operating a motor vehicle; would require a cane to ambulate; would be limited to performing simple, routine and repetitive tasks but not at a production-rate pace, i.e., assembly line work; limited to simple work-related decisions in using his judgment; able to frequently interact with supervisors, coworkers, and the public; and limited to simple work-related decisions in dealing with changes in the work setting.  Tr. 82-83.   The VE indicated that the previously identified jobs would still remain available, with the same numbers.  Tr. 83.

For his third hypothetical, the ALJ asked the VE to assume the same limitations included in the second hypothetical but adding that, in addition to normal breaks, the hypothetical individual would be off task 5% of an eight-hour workday.  Tr. 83.  The VE indicated that the previously identified jobs would still remain available, with the same numbers.  Tr. 83.

For his fourth hypothetical, the ALJ asked the VE to assume the same limitations included in the second hypothetical but adding that, in addition to normal breaks, the hypothetical individual would be off task 20% of an eight-hour workday.  Tr. 83-84.  The VE

---

[8] The VE provided regional and national job incidence data for each of the identified jobs.  Tr. 82.

indicated that the 20% off task limitation would preclude competitive employment.  Tr. 84.   In response to questioning by Hoover's attorney regarding an acceptable percentage of off-task behavior, the VE indicated that being off tasks more than 10% of the time would result in no jobs.  Tr. 84.

With respect to the ALJ's second hypothetical sit-stand option, Hoover's attorney asked the VE whether his answer would change if the interval of time for alternating between standing and sitting was shortened from one hour to 30 minutes.  Tr. 84-85.   The VE indicated that the time interval generally would not matter as long as the individual could stay on task at the work station because the identified jobs could be performed either sitting or standing.[9]  Tr. 85.

Hoover's attorney also asked the VE whether his answer regarding the jobs identified would change if the hypothetical individual required a cane for standing as well as for ambulating.  Tr. 85-86.  The VE responded that requiring a cane for standing could have an impact on the availability of employment because the jobs identified required that the individual use both hands for handling, packaging, and manipulating objects and products.  Tr. 86.  Thus, if an individual had to lean on something with one hand while standing and chose to stand for more than 10% of the time, employment would be eliminated.  Tr. 86.

Further, in response to additional questioning by Hoover's attorney, the VE indicated that employment would pretty much be eliminated if an individual required two additional 15-minute, unscheduled breaks during the workday.  Tr. 86.

### III. Standard for Disability

Under the Act, 42 U.S.C § 423(a), eligibility for benefit payments depends on the existence of a disability.  "Disability" is defined as the "inability to engage in any substantial

---

[9] If it would take the individual a long time to transition between sitting and standing, the VE noted that that could result in a situation where the individual would be off task for more than 10% of the workday.  Tr. 85.

gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).  Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . .

42 U.S.C. § 423(d)(2).

In making a determination as to disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations.  The five steps can be summarized as follows:

1. If the claimant is doing substantial gainful activity, he is not disabled.

2. If the claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3. If the claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, the claimant is presumed disabled without further inquiry.

4. If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if the claimant's impairment prevents him from doing past relevant work.  If the claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5. If the claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. § 416.920;  *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42, 96 L. Ed. 2d 119, 107 S. Ct. 2287 (1987).  Under this sequential analysis, the claimant has the burden of proof at Steps One through Four.  *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).  The

burden shifts to the Commissioner at Step Five to establish whether the claimant has the

Residual Functional Capacity ("RFC") and vocational factors to perform work available in the

national economy.  *Id.*

### IV. The ALJ's Decision

In his November 16, 2015, decision, the ALJ made the following findings:[10]

1.  Hoover had not engaged in substantial gainful activity since December 3, 2013, the application date.  Tr. 32.

2.  Hoover had the following severe impairments: prior laminectomy at L3 with stable lower lumbar spine facet arthropathy and mild to moderate multilevel spondylosis; minimal retrolisthesis of C4 and C5 with spondylosis at C3-4 and C4-5 with canal and foraminal stenosis; depression; and obesity.  Tr. 32.

3.  Hoover did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments.  Tr. 32-34.

4.  Hoover had the RFC to perform sedentary work as defined in 20 C.F.R. § 416.967(a) except: he could occasionally lift and carry 10 pounds and frequently lift and carry less than 10 pounds; he could sit for 6 hours of an 8-hour workday with the ability to alternate to standing for 5 minutes after every hour of sitting; he could stand or walk for 2 hours of an 8-hour workday with the ability to alternate to sitting for 5 minutes after every hour of standing or walking; he could push or pull within the lifting and carrying limitations; he could occasionally climb ramps or stairs; he could never climb ladders, ropes or scaffolds; he could occasionally balance, stoop, kneel, crouch or crawl; he should never be exposed to unprotected heights, moving mechanical parts, or operating a motor vehicle; limited to simple, routine and repetitive tasks but not at a production rate pace (e.g., assembly line work); limited to simple work-related decisions in using his judgment; could frequently interact with supervisors, coworkers, and the public; limited to simple work-related decisions in dealing with changes in the work setting; and requires a cane to ambulate.  Tr. 34-39.

5.  Hoover was unable to perform any past relevant work.  Tr. 40.

6.  Hoover was born in 1966 and was 47 years old, defined as a younger individual age 45-49, on the date the application was filed.  Tr. 40.

---

[10] The ALJ's findings are summarized.

7.  Hoover has at least a high school education and is able to communicate in English.  Tr. 40.

8.  Transferability of job skills was not material to the determination of disability.  Tr. 40-41.

9.  Considering Hoover's age, education, work experience and RFC, there were jobs that existed in significant numbers in the national economy that Hoover could perform, including table worker, final assembler, and bonder.  Tr. 41-42.

Based on the foregoing, the ALJ determined that Hoover had not been under a disability since December 3, 2013, the date the application was filed.  Tr. 42.

## V. Parties' Arguments

Hoover presents three arguments.  First, Hoover argues that the ALJ erred in weighing the opinion of his treating physician Dr. Nickels.  Doc. 12, pp. 11-14.  Second, he argues that the ALJ erred in assessing limitations caused by his severe neck impairment.  Doc. 12, pp. 14-16.  Last, Hoover argues that the ALJ erred in evaluating the opinion of consultative examining psychologist Dr. Wax.  Doc. 12, pp. 16-17.

In response, the Commissioner argues that the ALJ properly considered and evaluated the opinions of Dr. Nickels and Dr. Wax.  Doc. 14, pp. 12-16.  The Commissioner also argues that the ALJ reasonably assessed Hoover's neck pain and included limitations the ALJ found were supported by the evidence.  Doc. 14, pp. 9-12.

## VI. Law & Analysis

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record.  42 U.S.C. § 405(g); *Wright v. Massanari*, 321 F.3d 611, 614 (6th Cir. 2003).  "Substantial evidence is more than a scintilla of evidence but less

than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).   The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive."  *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)).

A court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility."  *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).  Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, a reviewing court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ."  *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).  When assessing whether there is substantial evidence to support the ALJ's decision, the Court may consider evidence not referenced by the ALJ.  *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001).

**A.**     **The ALJ properly considered Dr. Nickels' opinion**

Hoover argues that the ALJ did not properly consider or weigh the opinion of his treating physician Dr. Nickels.

Under the treating physician rule, "[t]reating source opinions must be given 'controlling weight' if two conditions are met: (1) the opinion 'is well-supported by medically acceptable clinical and laboratory diagnostic techniques'; and (2) the opinion 'is not inconsistent with the other substantial evidence in [the] case record.'"  *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 376 (6th Cir. 2013) (citing 20 C.F.R. § 404.1527(c)(2)); *see also Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004).

23

If an ALJ decides to give a treating source's opinion less than controlling weight, he must give "good reasons" for doing so that are sufficiently specific to make clear to any subsequent reviewers the weight given to the treating physician's opinion and the reasons for that weight. *Gayheart*, 710 F.3d at 376; *Wilson*, 378 F.3d at 544.  In deciding the weight to be given, the ALJ must consider factors such as (1) the length of the treatment relationship and the frequency of the examination, (2) the nature and extent of the treatment relationship, (3) the supportability of the opinion, (4) the consistency of the opinion with the record as a whole, (5) the specialization of the source, and (6) any other factors that tend to support or contradict the opinion.  *Bowen v. Comm'r of Soc Sec.*, 478 F.3d 742, 747 (6th Cir. 2007); 20 C.F.R. § 416.927(c).  An ALJ is not obliged to provide "an exhaustive factor-by-factor analysis" of the factors considered when weighing medical opinions.  *See Francis v. Comm'r of Soc. Sec.*, 414 Fed. Appx. 802, 804 (6th Cir. 2011).

The ALJ discussed Dr. Nickels' opinion and explained his consideration of Dr. Nickels' opinion, stating:

> Dr. Nickels opined on May 7, 2014 that the claimant was completely and totally disabled at this time (Exhibit B7F). He was unable to do any active lifting bending, pushing, or pulling. This is a permanent disability and the claimant is not expected to recover from into the future, and again, it is my medical opinion that he is completely and totally disabled on a permanent basis. A finding that an individual is "disabled" or "unable to work," is an administrative finding and is an issue reserved to the Commissioner (20 CFR 416.927(e)(l)). Medical opinions on these issues must not be disregarded; but they cannot be entitled to controlling weight or even given special significance, even when offered by a treating source (SSR 96-5p). The undersigned did consider this opinion but notes that the preponderance of the evidence does not support a finding of disability.

Tr. 38-39.

As correctly stated by the ALJ, opinions that a claimant is disabled or unable to work are issues ultimately reserved to the Commissioner.  20 C.F.R. § 416.927(d).  Further, while treating

source opinions on issues reserved to the Commissioner may not be ignored, such opinions are never entitled to controlling weight.  *See* SSR 96–5p, 1996 WL 374183, * 2-3 (July 2, 1996); *see also Johnson v. Comm'r of Soc. Sec.*, 535 Fed. Appx. 498, 505 (6th Cir. 2013) (unpublished) ("If the treating physician . . . submits an opinion on an issue reserved to the Commissioner – such as whether the claimant is disabled, unable to work, the claimant's RFC, or the application of vocational factors – [the ALJ's] decision need only explain the consideration given to the treating source's opinion." ) (internal quotations and citations omitted); *see also Grider v. Comm'r of Soc. Sec.,* 2011 WL 1114314, * 4 (S.D. Ohio Mar. 25, 2011) (recognizing that a physician's "'sedentary' assessment was a conclusion on an issue reserved to the Commissioner").

There is no question that Dr. Nickels offered an opinion on an issue reserved to the Commissioner, i.e., that Hoover was disabled and unable to work.  Specifically, Dr. Nickels opined that:

> [Hoover is] completely and totally disabled at this time.  He is unable to do any active lifting, bending, pushing, or pulling.  This is a permanent disability for which we do not expect this patient to recover from into the future, and again, it is my medical opinion that he is completely and totally disabled on a permanent basis.

Tr. 374.

Hoover acknowledges that the ALJ correctly held that the ultimate issue of disability is reserved to the Commissioner yet contends that the ALJ nevertheless failed in his evaluation of Dr. Nickels' opinion.  He asserts that the ALJ did not mention other things that Dr. Nickels said, such as that Hoover had been tried on multiple treatments but still had severe low back pain and that Hoover could not perform any active lifting or bending.   However, the ALJ did not disregard those portions of Dr. Nickels' opinion.  *See* Tr. 36-37 (discussing Dr. Nickels' statements in his May 7, 2014, letter that Hoover had been treated for intractable back pain with various medications and treatment modalities but continued to have moderate to severe pain); Tr.

38 (referring to Dr. Nickels' statement that Hoover could not perform any active lifting, bending, pushing, or pulling).  Further, the ALJ made clear that the he considered Dr. Nickels' opinion but found that the preponderance of the evidence did not support Dr. Nickels' opinion that Hoover was completely disabled.  Tr. 38.  Hoover contends that the ALJ's finding in this regard was error, arguing that Dr. Nickels' opinion is supported by a preponderance of the evidence.  In making this argument, Hoover points to evidence of his lumbar issues, including herniated discs, as well as the opinion of his physician assistant Ms. Gold.  However, the ALJ fully considered the evidence of record, including Hoover's treatment history and Ms. Gold's opinion, but found that Hoover's impairments were not as disabling as Hoover contends.  Tr. 35-40.

Although Hoover disagrees with the ALJ's consideration and weighing of the evidence, it is not for this Court to "try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility."  *Garner*, 745 F.2d at 387.  Furthermore, although Hoover contends that there is evidence to support his position, even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, a reviewing court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ."  *Jones*, 336 F.3d at 477.  Hoover has not demonstrated a lack of substantial evidence to support the ALJ's determination regarding Dr. Nickels' opinion.

Based on the foregoing, the undersigned recommends that the Court find no error with the ALJ's consideration of Dr. Nickels' opinion.

**B.      The ALJ properly considered and accounted for limitations caused by Hoover's neck pain**

Hoover contends that the ALJ did not properly account for limitations caused by his severe neck impairments.  With respect to physical RFC limitations, the ALJ limited Hoover as follows:

26

> [C]laimant has the residual functional capacity to perform sedentary work as
> defined in 20 CFR 416.967(a) except: He could occasionally lift and carry ten
> pounds and frequently lift and carry less than ten pounds. He could sit for six hours
> of an eight-hour workday with and alternate to stand for five minutes after every
> hour of sitting. He could stand or walk for two hours of an eight-hour workday with
> an alternate to sit for five minutes after every hour of standing or walking. He could
> push or pull within the lifting and carrying limitations. He could occasionally climb
> ramps or stairs. He could never climb ladders, ropes or scaffolds. He could
> occasionally balance, stoop, knee, crouch or crawl. He should never be exposed to
> unprotected heights, moving mechanical parts or operating a motor vehicle.

Tr. 34.

Hoover argues that the ALJ should have included a limitation on the use of Hoover's

upper extremities due to cervical disc problems and that his failure to do so is error. In support

of his argument, Hoover points to objective evidence regarding his neck problem,[11] his

subjective complaints regarding his pain and symptoms associated with his neck problems, and

Ms. Gold's January 2014 assessment of Hoover's functional limitations, which included her

opinion that Hoover was limited to occasional reaching and fine manipulation, rarely performing

gross manipulation, and rarely performing pushing/pulling.

The Regulations make clear that a claimant's RFC is an issue reserved to the

Commissioner and the ALJ assesses a claimant's RFC "based on all of the relevant evidence" of

record. 20 C.F.R. §§ 416.945(a)(3), 416.946(c). Here, the ALJ considered the evidence

pertaining to Hoover's neck impairments, including evidence upon which Hoover relies to argue

---

[11] Included in the evidence that Hoover relies upon to support his claim that greater limitations should have been
included in the RFC to account for his neck impairment, is an August 2, 2016, MRI. Doc. 12, p. 15 (citing Tr. 7).
This MRI was performed after the ALJ's decision and only presented to the Appeals Council. The court's review,
however, is limited to the evidence presented to the ALJ. *See Foster v. Halter*, 279 F.3d 348, 357 (6th Cir. 2001);
*Cline v. Commissioner*, 96 F.3d 146,148 (6th Cir. 1996); *Cotton v. Sullivan*, 2 F.3d 692, 696 (6th Cir. 1993); *Casey
v. Secretary of Health & Human Servs.*, 987 F.2d 1230, 1233 (6th Cir. 1993); see also *Osburn v. Apfel*, No. 98-1784,
1999 WL 503528, at *4 (6th Cir. July 9, 1999) ("Since we may only review the evidence that was available to the
ALJ to determine whether substantial evidence supported [his] decision, we cannot consider evidence newly
submitted on appeal after a hearing before the ALJ.").

that greater RFC restrictions should have been included but found that the evidence did not support restrictions greater than those included in the RFC. Tr. 35-40.

For example, when considering and weighing Ms. Gold's assessment, the ALJ found that the record supported her opinion that Hoover was limited to less than a full range of sedentary work but concluded that her opinions were not consistent with the objective medical evidence of record. Tr. 38. Further, as observed by the ALJ, Ms. Gold, who is a physician assistant, is not an acceptable medical source. Tr. 38. Regarding Hoover's subjective allegations, the ALJ found his allegations only partially credible. Tr. 40. Hoover does not challenge the ALJ's credibility assessment nor has he shown that the ALJ erred by not including restrictions in the RFC that mirror Hoover's subjective allegations regarding limitations caused by his neck impairment.

The ALJ considered the evidence and explained his RFC assessment, which limits Hoover to less than a full range of sedentary exertional work. Those limitations include, among other restrictions, restrictions on lifting, carrying pushing, and pulling. As indicated above, it is not for this Court to "try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *Garner*, 745 F.2d at 387. Furthermore, Hoover has not shown that the ALJ's RFC is not supported by substantial evidence.

In light of the foregoing, the undersigned recommends that the Court find that the ALJ properly considered and accounted for limitations caused by Hoover's neck pain.

**C.    The ALJ properly considered Dr. Wax's opinion**

Hoover argues that the ALJ erred with respect to his evaluation of the opinion of consultative examining psychologist Dr. Wax.

There is no dispute that the ALJ considered and weighed Dr. Wax's consultative examining opinion. The ALJ stated the following with respect to Dr. Wax's opinion:

> Mitchell Wax, Ph.D., performed a consultative psychological evaluation on February 25, 2014 (Exhibit B5F). The claimant reported having no prior psychiatric hospitalizations, and no prior psychiatric care. He stated he was not in counseling. He reported he last used crack cocaine, crystal meth and marijuana in April of 2010. He reported he last drank in April 2010. During the evaluation, he appeared in physical distress with him wincing, sighing, and standing due to apparent back pain. The claimant reported he had anger issues, getting into argument four times a week with family members and strangers. He stated he could not do much due to his back pain. He said he could not stand, sit or lay down longer than one to two hours before having to change positions.  He spends most of his day watching TV or going on the internet.  He stated he could not do household chores, but he could walk to the corner store for one or two items.  He has friends and he socializes with them regularly.  Dr. Wax diagnosed major depression.  Dr. Wax opined the claimant would be able to understand, remember and carry out instructions to work at a job. He is able to perform simple tasks and perform multi-step tasks based upon his ability to go to the corner store for one or two items, and he was able to perform simple tasks and perform multi-step tasks during the evaluation.  He would have difficulty responding appropriately to supervisors and coworkers in a work setting due to his depression.  He would not respond appropriately to work pressures in a work setting due to his depression. The undersigned gave weight to Dr. Wax's opinions to the extent the evidence shows that the claimant has limitations with social interaction and stress intolerance.

Tr. 38.

Hoover contends that Dr. Wax opined that Hoover could not withstand the pressures of any work, (Doc. 12, p. 17 (emphasis added)) and argues that the ALJ erred because, although the ALJ assigned some weight to Dr. Wax's opinion, the ALJ formulated an RFC that was not as restrictive as Dr. Wax's opinion.  Hoover also argues that the ALJ did not sufficiently explain why he did not adopt Dr. Wax's opinion verbatim.  For the reasons discussed below, the undersigned finds Hoover's arguments to be without merit.

Here, the ALJ's explanation of his consideration of the evidence and weight assigned to Dr. Wax's opinion makes clear that he did not find Hoover's limitations as restrictive as those contained in Dr. Wax's opinion.  The ALJ explained that he "gave weight to Dr. Wax's opinion to the extent that the evidence shows that the claimant has limitations with social interaction and stress intolerance."  Tr. 38.  In discussing the evidence of record, the ALJ discussed Hoover's

reported arguments with others but also noted that Hoover visited with friends, spoke regularly with his sponsor, and traveled with family to a family reunion.  Tr. 33, 35.  Also, as discussed by the ALJ, Dr. Wax's evaluation reflects that Hoover had no prior psychiatric hospitalizations, no prior psychiatric care, and he was not attending counseling.  Tr. 38, 363.   The ALJ's decision makes clear that the ALJ weighed Dr. Wax's opinion in light of evidence regarding his mental impairments.

Further, as explained above, the Regulations make clear that a claimant's RFC is an issue reserved to the Commissioner and the ALJ assesses a claimant's RFC "based on all of the relevant evidence" of record.  20 C.F.R. §§ 416.945(a)(3), 416.946(c).   Additionally, the ALJ, not a physician, is responsible for assessing a claimant's RFC.  *See* 20 C.F.R. § 404.1546 (c); *Poe v. Comm'r of Soc. Sec.*, 342 Fed. Appx. 149, 157 (6th Cir.2009).  In assessing a claimant's RFC, an ALJ "is not required to recite the medical opinion of a physician verbatim in [her] residual functional capacity finding[ ] [and] an ALJ does not improperly assume the role of a medical expert by assessing the medical and nonmedical evidence before rendering a residual functional capacity finding." *Id.*  Thus, while the ALJ did not adopt Dr. Wax's limitations verbatim, as discussed herein, the ALJ was not required to do so.  Also, the ALJ did not ignore Dr. Wax's opinion.  The ALJ included mental limitations to account for limitations in handling workplace stress.  For example, the ALJ limited Hoover to "simple, routine and repetitive tasks but not at a production rate pace (e.g., assembly line work) [and] . . . simple work-related decisions in using his judgment . . . [and] simple work-related decisions in dealing with changes in the work setting."  Tr. 34.  These limitations are supported by Dr. Wax's opinion.

Additionally, it is not clear that Hoover's reading of Dr. Wax's opinion is entirely accurate.  While Dr. Wax opined that Hoover would not be able to respond appropriately to work

pressures in a work setting due to his depression, Dr. Wax also opined that Hoover would be able to understand, remember, and carry out instructions to work at a job and he would be able to maintain attention and concentration on a job.  Thus, contrary to Hoover's suggestion, Dr. Wax did not opine that Hoover was completely disabled or unable to work.   And, even if Dr. Wax's opinion were deemed to be an opinion that Hoover was unable to work, as discussed above, such an opinion is an opinion on an issue reserved to the Commissioner.

For the reasons discussed herein, the undersigned recommends that the Court find no error with respect to the ALJ's consideration of Dr. Wax's opinion.

## VII. Recommendation

For the foregoing reasons, the undersigned recommends that the Court **AFFIRM** the Commissioner's decision.

October 24, 2017

_____
Kathleen B. Burke
United States Magistrate Judge

## OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation.  Failure to file objections within the specified time may waive the right to appeal the District Court's order.  See *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).  *See also Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).